# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF ARKANSAS
# HOT SPRINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 6:23-MJ-06006 |
| v. ) | |
| ) | FILED UNDER SEAL |
| DEREK SCOTT FINKBEINER ) | |

## AFFIDAVIT

I, Brian Ambrose, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), hereby depose and state that the following is true and correct upon my personal knowledge, investigation, and belief.

## BACKGROUND & AFFIANT EXPERIENCE

1. I am a Special Agent of the Federal Bureau of Investigation, United States Department of Justice. I am an "Investigative or law enforcement officer . . . of the United States" within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I have been employed as a Special Agent of the FBI since March 2018. I am currently assigned to the Little Rock Division's White Collar Crime Squad, with the responsibility of leading investigations involving public corruption of domestic public officials. I have also served as a member of the Special Weapons and Tactics (SWAT) team for approximately four years, and in connection with those responsibilities have participated in large-scale arrests of drug trafficking and violent offenders. In connection with my official duties, I am charged with investigating violations of federal criminal laws. I have received training in narcotics enforcement, money laundering, violent crimes, and asset forfeiture.

1

3. During my time as a law enforcement officer, I have participated in numerous investigations of unlawful narcotics distribution, public corruption, firearms violations, and violent crime, including gang activity and crimes against children. My experience encompasses both domestic and extraterritorial investigations including multi-agency, multi-government efforts focused on disrupting international criminal organizations conducting large scale narcotics trafficking, money laundering and other illicit activities. I have been involved in all aspects of federal criminal investigations, including, among other things, debriefing defendants, sources, and informants; conducting surveillance and undercover operations; executing search and seizure warrants; reviewing Call Detail Records, monitoring Title III wiretaps; and analyzing documentary and physical evidence. I have been tasked with operating multiple Confidential Human Sources, also referred to as Confidential Informants (CI). Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, distributed, and the methods of payments for such drugs. I am also familiar with the methods by which narcotics traffickers communicate and the code words commonly used by narcotics traffickers. I am also familiar with the manner and methods by which drug dealers launder their proceeds of illicit drug trafficking and distribution, as well as their use of firearms to protect themselves, their proceeds, and their drugs. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal law, as listed below, have been committed by Derek Scott FINKBEINER. The suspected violation is as follows:

i. Title 18, United States Code, Section 1512(c)(2), commonly referred to as Obstruction of Justice.

**JURISDICTION**

5. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by Title 18, United States Code, Section 2711. Specifically, the Court is a District Court of the United States that has jurisdiction over the offense(s) being investigated as defined by Title 18, United States Code, Section 2711(3)(A)(i).

**PROBABLE CAUSE**

I. **AUDIO RECORDING AT** ▮ ▮

6. On May 16, 2023, the Group 6 Narcotics Enforcement Unit (Group 6) and Malvern Police Department notified the Federal Bureau of Investigation, Little Rock Field Office, of an ongoing narcotics investigation into ▮, telephone numbers ▮ and ▮. Group 6 conducted seven (7) controlled purchases of substances believed to be methamphetamine (meth), between April 13, 2023, and May 24, 2023, from ▮ at his residence located at ▮ ▮, Perla, Arkansas, which is located in Hot Spring County. Hot Spring County, Arkansas, is located within the Hot Springs Division of the Western District of Arkansas. All controlled purchases were audio and/or video recorded using the same Confidential Informant (CI1), and all purchased substances were field tested with positive results for methamphetamine.

7. CI1 arranged the controlled purchases of meth from ▮ via phone call and text message to ▮ phone, ▮. Toll records for ▮ phone, ▮, and content of text messages provided by CI1 corroborate use of that facility to arrange the meetings and transactions.

3

8. CI1 reported to Group 6 that approximately a week prior to the controlled purchase on April 13, 2023, CI1 was at ▮ residence and had a conversation with ▮ regarding his friend "Scott." ▮ told CI1, that Scott was the new Sheriff, they were friends for a long time and smoked meth together. ▮ told CI1 that Scott left ▮ ▮ immediately before he/she arrived on that day.

9. Following the conversation with ▮, CI1 confirmed via text message to ▮ ▮, using a picture from Facebook, that ▮ friend, "Scott," was Hot Spring County Sheriff, Derek Scott FINKBEINER, telephone number ▮. Derek Scott FINKBEINER is the elected Sheriff of Hot Spring County, Arkansas, entering office in or around January of 2023. Further, based on my own personal knowledge and information obtained during the course of this investigation, FINKBEINER utilizes his middle name of Scott in his day to day life and is generally known as "Scott" FINKBEINER, as opposed to "Derek" FINKBEINER.

10. At approximately 2:00am on May 21, 2023, while CI1 was at ▮ residence, not under tasking by Group 6 investigators, ▮ told CI1 that FINKBEINER was on his way over to ▮ ▮. At that point, CI1 began audio recording through an application on his/her cellphone. According to CI1, voices captured on the audio recording belong to CI1, ▮ and FINKBEINER. Analysis of Call Detail Records for FINKBEINER's phone, ▮, reflect a phone call to ▮ phone as well as cellular activity including ten (10) additional phone calls and two (2) text messages exchanged with other individuals from approximately 12:19am through 2:51am on May 21, 2023. Historical Cellular Site data provided by Verizon Wireless for FINKBEINER's phone show that all eleven (11) calls made or received during that period place FINKBEINER's cellular phone in the coverage area for the cellular tower and sector covering ▮ ▮. The cellular tower and sector that cover the vicinity of ▮

███ is distinct from the cellular tower and sector that cover the vicinity of the Hot Spring County Sheriff's Office, which is also distinct from the cellular tower and sector that cover the vicinity surrounding FINKBEINER's residence.

11. CI1 provided a description of activities and interactions that occurred in his/her presence at ███████████ and which were captured during the audio recording on May 21, 2023. The recording corroborates CI1's reporting regarding the timeline, sounds and conversations captured therein. Any text quoted in the summary refers to transcribed words captured on the audio recording. CI1's description, as corroborated by the recording is as follows:

  i. CI1 met FINKBEINER in the driveway of ███████████ by his white police vehicle, wearing a green polo shirt with gold writing on the upper chest and some sort of vest. After a brief conversation with CI1, FINKBEINER removed his badge and firearm and left them in the car before walking into ███████████ with CI1. Immediately upon entering ███████████, ██████ handed FINKBEINER a pipe with meth in it. FINKBEINER sat in the main room of the residence and began to smoke from the pipe.

  ii. ██████ left the main room and FINKBEINER propositioned CI1 for sex. He took out approximately $60.00 in cash and said, "I'll make it worth your while." CI1 told FINKBEINER that he/she was not a prostitute. FINKBEINER then asked CI1 to perform oral sex on him. CI1 refused.

  iii. CI1 told FINKBEINER that he/she did not want to do anything while ██████ was in the next room. In response, FINKBEINER offered to follow him/her home. In reference to the proposition for sex, FINKBEINER also told CI1, "…he's [██████]

the one that suggested it" and "that's why he went in there he said he was going to give me some time."

 iv. After ▇ returned to the room, CI1 indicated that he/she had to leave. At that point, FINKBEINER offered CI1 the meth pipe he was smoking from and said, "Can you do me one favor before you leave, it'll make me feel better, take a puff of that." ▇ then said, "You don't need to worry about him [FINKBEINER], he's been my friend for damn near 35-40 years already… we're like brothers." CI1 reported that he/she smoked from the pipe and handed it back to FINKBEINER.

 v. FINKBEINER told ▇ to leave the room again and asked CI1 to sit next to him on the couch. ▇ left the room and CI1 sat next to him. FINKBEINER propositioned him/her again to perform oral sex.

 vi. CI1 reported that he/she felt intimidated since FINKBEINER was wearing a uniform and said earlier that he could follow him/her home. CI1 reported that FINKBEINER started to unbutton his pants, grabbed CI1's hand and put it on his penis.

 vii. CI1 reported that he/she thought "it was either sex or a hand job," so he/she used lotion that was near the couch and indicated that he/she gave FINKBEINER a "hand job." CI1 reported that he/she had to stop after he/she started gagging and felt like he/she was going to vomit.

 viii. He/She left the residence shortly after the audible sex act occurred on the recording.

## II. CONTROLLED PURCHASE OF NARCOTICS

12. On August 03, 2023, FBI conducted the controlled purchase of narcotics from ▇ at ▇. The drug buy was audio and video recorded, and is summarized as follows:

i. After CI1 knocked and rang the doorbell multiple times, ▮ answered the door and let CI1 inside just after 08:40am.

ii. ▮ said he just woke up and forgot that CI1 would be stopping by. CI1 observed a female, ▮ later identified as his girlfriend, asleep on the couch.

iii. ▮ sat down in a chair in the kitchen and appeared to keep falling asleep, before getting up and starting to make coffee.

iv. As he was making coffee, ▮ told CI1 that the Sheriff, Scott FINKBEINER, was at his house the previous night. ▮ said the Sheriff had known the female asleep on the couch from a long time ago.

v. CI1 left the house at approximately 08:55am to go to his/her vehicle and smoke a cigarette. When he/she went back in the residence, CI1 could not find ▮.

vi. As he/she was calling for ▮ and looking around the residence, CI1 ran into an unknown male in the house that introduced himself as "Joe." Joe spoke briefly with CI1 before CI1 continued to look for ▮.

vii. CI1 found ▮ looking for his supply of meth, and the two spoke about how the man in the house who introduced himself as "Joe" was actually FINKBEINER. CI1 did not immediately recognize FINKBEINER. CI1 then returned to the kitchen to wait for ▮ to complete the purchase.

viii. At approximately 09:02am, while waiting for ▮, CI1 initiated a conversation with FINKBEINER. In that conversation, FINKBEINER said that he did not remember meeting CI1. During that conversation, CI1 addressed him as "Scott," reintroduced himself/herself and referenced the occasion they last met at ▮ residence (which was on May 21, 2023, the date of the previously referenced audio recording provided

7

by CI1). A brief conversation about FINKBEINER possibly pulling over CI1 also took place.

ix. Prior to leaving the residence, CI1 inquired to ▮ where FINKBEINER was in order to say goodbye since he/she looked around the residence and could not find him. ▮ asked CI1 to check if FINKBEINER's vehicle was still parked in the backyard. CI1 checked out back and saw FINKBEINER's black sedan parked far back in the tree line on the property.

x. ▮ found some meth and weighed it out for CI1. While ▮ was preparing the meth for sale, CI1 inquired about FINKBEINER's vehicle parked out back and the two discussed how it was a police vehicle.

xi. At approximately 09:37am, ▮ placed the scales in the cabinet above the oven/stove top. ▮ said FINKBEINER went back to his car because he had to go home.

xii. CI1 asked if anyone wondered where FINKBEINER was and ▮ replied that, "they can't say shit, he's the Sheriff... he'll fire their ass." ▮ then referenced an individual named "Rainer" or "Raymond," saying that the Sheriff ran Rainer/Raymond out of town.

xiii. At approximately 09:40am ▮ handed the packaged substance to CI1. ▮ briefly mentioned that someone posted a statement on Facebook saying, "Girl went on Facebook and said, 'somebody needs to tell Scott... he's stopping down at Mr. ▮ house and getting high on crack, he's stopping me from making my money.'...Because they see his car down here." ▮ and CI1 exited the residence and spoke briefly by the vehicle before CI1 exited the property.

13. Following the controlled purchase, CI1 was debriefed, searched, and confirmed that FINKBEINER was the man he/she interacted with at ███ ███████. Immediately after CI1 departed ███████ residence, a black Dodge Charger law enforcement vehicle with multiple radio antennas departed the property. Physical surveillance followed the Charger to FINKBEINER's known residence in Malvern, Arkansas. Additionally, the substance distributed by ██████ to CI1 was field tested with a positive result for methamphetamine.

14. Analysis of Historical Cellular Site data provided by Verizon Wireless for FINKBEINER's phone, ███████████, show twelve (12) calls made or received from the cellular tower and sector covering ███ ████████ between 9:26pm the night prior through 8:30am the morning of the controlled purchase of narcotics. FINKBEINER's phone called ████████ phone eight (8) times between 9:42pm and 10:37pm on the night prior to the controlled purchase, when ██████ told CI1 that FINKBEINER was at ███ ████████.

### III. VIDEO SURVEILLANCE FOOTAGE / INTERVIEW OF SUBJECT

15. An FBI video surveillance camera was placed on public property in the vicinity of ███ ████████ on August 18, 2023. On August 19, 2023, at approximately 12:56am, video surveillance captured a white vehicle drive up in front of the residence located at ███ ████████. Shortly thereafter, blue lights consistent with a police vehicle were observed flashing, and an older thin black male, meeting the description for ██████ came outside. ██████ as well as an unidentified young white female stood out front next to the occupied white vehicle. Both ██████ and the unidentified female appeared to speak with the individual inside the vehicle. During that time, another unidentified white female approached the group from the vicinity of ███ ████ ██████, then returned to a vehicle parked in the driveway of the residence.

16. After approximately 10-15 minutes, ▮ and the unidentified young white female motioned in the direction of the surveillance camera. At that point, a larger white male, meeting the description of FINKBEINER, exited the vehicle wearing a dark polo-style shirt with yellow or gold writing on the left chest, tucked into khaki pants. ▮ then pointed at the camera, and FINKBEINER briefly flashed a flashlight at the camera before returning to his vehicle and shutting the door. Analysis of historical cellular site data for FINKBEINER's phone, ▮, reflect a phone call made from FINKBEINER's phone to ▮ phone at 12:57am from the coverage area for the cellular tower and sector covering ▮.

17. Later in the day on August 19, 2023, FINKBEINER called FBI Little Rock Special Agent Jennifer Nicholls multiple times via his ▮ phone number. During the first call, FINKBEINER told SA Nicholls that he found a pole camera on ▮ and indicated that his "CI" residing on ▮ identified the camera 2-3 days prior.

18. FINKBEINER told SA Nicholls that he visited his CI after midnight on August 19, 2023, and he confirmed the existence of the pole camera by flashing his light at it. FINKBEINER asked if it was an FBI pole camera. SA Nicholls responded that she did not know, but would follow up after the weekend, to which FINKBEINER indicated he would "be shocked" if there was any major narcotics on Adams Street.

19. FINKBEINER indicated that the CI that resides on ▮ is a source of information and evidence for allegations related to an investigation into the theft of city funds involving another resident on ▮. FINKBEINER indicated he knew this CI because he knew the CI's mother and that he had no concerns of violence occurring on ▮.

20. FINKBEINER contacted SA Nicholls a few hours later via his ▮ phone number and indicated that he identified the individual who put up the pole camera as Aaron

Hurst and asked whether or not he worked for the FBI. SA Nicholls confirmed that the individual worked for the FBI and she again told FINKBEINER she would follow up on Monday.

21. Shortly after that phone call, at approximately 1:54pm on August 19, 2023, FINKBEINER called Special Agent Aaron Hurst's cell phone and left a voicemail identifying himself and requesting a call back.

22. On Monday, August 21, 2023, FINKBEINER was contacted by Special Agents with the FBI in response to his multiple requests for information regarding the installation of the pole camera in the vicinity of ▮ ▮. The telephone conversation was recorded.

23. During the conversation, FINKBEINER indicated that ▮ is his CI, but since ▮ is not used to purchase narcotics, he is not documented on paper as an informant with the Hot Spring County Sheriff's Office. FINKBEINER said that ▮ was a material informant on a theft of government funds investigation into a Subject on ▮ as well as a recent drug arrest made by Hot Spring County Sheriff's Office.

24. FINKBEINER indicated he has known ▮ for a long time. FINKBEINER said ▮ is a "shady individual," and was previously a drug user, but as far as FINKBEINER knew, ▮ "has never been a drug seller." FINKBEINER indicated he made it a point to drive by his Subject's residence on ▮, saying "I drive through there all the damn time."

25. FINKBEINER asked Agents, "My question is, who is the target? I mean, hell, if we are working in there, you know, who is y'alls target?" Interviewing Agents told FINKBEINER that the pole camera was placed on ▮ as part of a drug investigation.

26. Agents asked if FINKBEINER knew of anything about drugs or gangs or anything that could be occurring on ▮. FINKBEINER responded with, "Now ▮

11

probably still does some drugs, he's not, I assure you, he ain't moving a bunch of drug weight. If he is, I'll pass out, you know, if he had any significant drug roll."

27.     FINKBEINER said, to the knowledge of Hot Spring County Sheriff's Office, there is no significant drugs, other than use, on ▇▇▇▇. Agents asked FINKBEINER his thoughts on the viability of leaving the surveillance camera in place. FINKBEINER said it would be useless since his subject knows it's there. FINKBEINER indicated that he went to ▇▇▇▇ residence at midnight on August 19, 2023, because he forgot to give him paperwork related to a fraud claim made by ▇▇▇▇.

28.     FINKBEINER discussed the unknown females captured on the video surveillance footage on August 19, 2023, and indicated that he knew one of them to be a drug user, but said that he only spoke with ▇▇▇▇, not the other females present, about the pole camera. Agents asked FINKBEINER why he thought the female drug user would be at ▇▇▇▇ residence at that time. FINKBEINER responded that ▇▇▇▇ is one of those guys that always has girls that come by to see him.

29.     FINKBEINER then stated:

*Now there are all kinds of people that got dope, you say well they be just coming by there and he's just give them some dope or whatever, well I don't think first off he's not in the business of selling, I don't believe, I mean he might move a small amount, I don't… he's not on our radar… we've got other CIs that are acting like they don't sell but they are selling and we know it…he's not one of those.*

30.     FINKBEINER further stated:

*There is nobody on the radar that come to us at all and said he is moving any dope, you know in a significant amount, so I don't think they are necessarily coming there for drugs, they're coming there for sex.*

31.     Later in the call, in reference to the Sheriff's Office Subject located on ▇▇▇▇ ▇▇▇▇, FINKBEINER stated:

*He made the damn comment that I was buying drugs and selling them from* ▇▇▇, *which is, you know, you can look at my damn bank account and see that ain't right. But he don't like me, so I don't give a damn.*

32. Before ending the call, FINKBEINER stated:

*I would be absolutely shocked, but if* ▇▇▇ *is moving a bunch of weight of drugs then take him down. But if he's just small-timing it, I would really appreciate it if y'all could wait until we get [the identified HSCSO subject on* ▇▇▇*].*

## IV. STATEMENTS BY FINKBEINER AT STATE PROSECUTOR'S OFFICE

33. On August 22, 2023, FINKBEINER told a Malvern Police Department Lieutenant at the State Prosecutor's Office of his frustration with the FBI's involvement in a case he is working. FINKBEINER mentioned the FBI set up a pole camera that was complicating a case. FINKBEINER intended to issue a type of order where he would establish a 14-block perimeter around the designated area. FINKBEINER then asserted that if any FBI Agents were to enter that area he would, "arrest every goddamn one of those FBI sons of bitches that steps foot over there." The Sheriff then emphasized that he believed the FBI has been monitoring the wrong individual and vowed not to allow any further disruption of the case.

34. On August 23, 2023, FINKBEINER went to the Hot Spring County State Prosecutor's Office again complaining about the FBI. Multiple individuals were present for the interactions, including the State Prosecutor and a Malvern Police Sergeant. FINKBEINER was very vocal about how the FBI interfered with his investigation by putting a pole camera outside his Confidential Informant's house. FINKBEINER said his informant was a good guy, he's known him for a long time, and he felt like he could spend the night on the informant's couch and not worry about a thing.

35. FINKBEINER told the State Prosecutor that there was going to be a meeting with an FBI Agent and his informant on August 23, 2023, at 3:00pm, and FINKBEINER intended to

speak with the Agent prior to that meeting. If he did not like how that conversation with the FBI Agent went, FINKBEINER indicated that he would tell his informant not to speak with the FBI. FINKBEINER also mentioned he would tell his informant to invoke his 5th Amendment right.

36. According to the State Prosecutor, FINKBEINER seemed "amped up" and angry at the FBI and was very vocal about his feelings. FINKBEINER was speaking about potential avenues for arresting an FBI Agent for interfering with a Hot Spring County operation. FINKBEINER also mentioned making calls to the Sheriff's Association and to someone he knew in the media about how the FBI is interfering in Hot Spring County investigations.

## CONCLUSION

37. Historical Cell Site data for target phone ▮▮▮▮▮▮▮, shows that FINKBEINER's phone made or received phone calls while in the vicinity of the cellular tower and sector covering ▮▮ ▮▮▮▮▮▮ on or around each occasion cited previously for when FINKBEINER was allegedly at ▮▮ ▮▮▮▮▮▮ and present for or engaged in illegal activity, including the use of illegal drugs, solicitation of sex, and sale of methamphetamine.

38. Cellular phone toll records for FINKBEINER reflect frequent and consistent contact with ▮▮▮ between January 1, 2023, and October 2, 2023. Analysis of toll records received for FINKBEINER for that period reflect 130 phone calls exchanged between FINKBEINER and ▮▮▮. Based on the information received from toll analysis, 108 of the 130 phone calls were made between 8pm and 3am, of which 63 phone calls were made after 10pm.

39. Based on the aforementioned information, I believe probable cause exists to show that Derek Scott FINKBEINER corruptly endeavored to obstruct, influence, and impede an official proceeding by attempting on multiple occasions to mislead federal investigators away from ▮▮▮▮, ▮▮ ▮▮▮▮▮▮ and the illegal activity he knew to be occurring therein.

40. Prior to and since taking the office of Hot Spring County Sheriff, FINKBEINER provided information to and worked with the FBI on multiple federal investigations with open and active grand jury files. FINKBEINER is familiar with the federal investigative process and has observed and participated in the service of federal grand jury subpoenas and the execution of federal search warrants in Hot Spring County. Additionally, on one occasion, FINKBEINER was acutely aware of the deployment and operation of an FBI pole camera for a federal investigation with an ongoing grand jury file.

41. During the recorded interview with FBI Agents on August 21, 2023, FINKBEINER indicated he was aware of an FBI surveillance pole camera in place in the vicinity of ▆▆ and was explicitly told by the interviewing Agent that it was placed as part of an ongoing FBI investigation involving drugs. After clearly understanding that a surveillance camera was placed on ▆▆ pursuant to an ongoing federal investigation, FINKBEINER then made statements to the interviewing Agents as well as on separate occasions to other federal Agents, two Malvern Law Enforcement Officers, and a State Prosecutor, minimizing any knowledge of illegal activity involving ▆▆ or ▆▆.

42. On at least one occasion, ▆▆ provided methamphetamine to FINKBEINER, facilitated a sex act and arranged for the sale of narcotics while FINKBEINER was present at ▆▆ residence. Additionally, in my training and experience, the volume of phone contact between ▆▆ and FINKBEINER during the hours of 10pm and 3am is consistent with drug activity and not indicative of how a law enforcement officer operates a legitimate confidential informant. ▆▆ made statements to CI1 concerning the inability of anyone to question FINKBEINER's activity at ▆▆ due to his position as an elected Sheriff. Based on my training and experience, I believe FINKBEINER's actions and statements were an effort to

corruptly mislead federal investigators, and ultimately obstruct, influence, or impede an official proceeding.

43. Based upon the foregoing facts, there is probable cause to believe that Derek Scott FINKBEINER has violated Title 18, United States Code, Section 1512(c)(2), commonly referred to as Obstruction of Justice.

44. Therefore, I respectfully submit this Affidavit in support of a Criminal Complaint and pray that a warrant be issued forthwith for FINBEINER's arrest thereupon.

                                                                 Respectfully submitted,

                                                                 /s/ *Brian Ambrose* (telephonically)
                                                                 BRIAN AMBROSE
                                                                 Special Agent
                                                                 Federal Bureau of Investigation

Sworn to before me on this _____ day of October, 2023.

                                                                _____

                                                                HON. BARRY A. BRYANT
                                                                United States Magistrate Judge
City and State: _____, Arkansas        Western District of Arkansas